UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                        :
THE BABCOCK & WILCOX       :      CASE NO. 5:05-cv-00047
COMPANY,                    :
                        :
          Plaintiff,       :
                        :
vs.                        :      MEMORANDUM & OPINION
                        :      [Resolving Doc. Nos. 44, 53]
HITACHI AMERICA, LTD.,      :
                        :
         Defendant.     :
                        :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On January 10, 2005, Plaintiff Babcock & Wilcox Company ("B&W") sued Defendant Hitachi America, Ltd. ("Hitachi").  In its complaint, the plaintiff asserts claims for: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranty of fitness for a particular purpose; and (4) breach of the obligation of good faith and fair dealing.

On September 6, 2005, Hitachi filed a partial motion for summary judgment, seeking only to resolve the scope of the contract between the parties and to identify the precise performance guarantee and warranty provisions included in that contract. [Doc. No. 44].  On September 26, 2005, B&W filed a response and cross-motion for partial summary judgment.  B&W similarly limits its motion to the issue of what terms constitute the controlling contract between the parties. [Doc. No. 53].

For the reasons discussed below, the Court **GRANTS** in part and **DENIES** in part both B&W and Hitatchi's motions for partial summary judgment.

-1-

Case No. 5:05-cv-00047
Gwin, J.

## BACKGROUND

This case involves an emissions reduction system, known as a Selective Catalytic Reduction System ("SCR system"), that Plaintiff B&W designed and installed at a coal-fired electrical power plant in Kansas City, Missouri. One of the key components of the SCR system is a catalyst used to convert nitrogen oxide ($NO_x$) into nitrogen ($N_2$) and water ($H_2O$) vapor, thus reducing the nitrogen oxide emissions from the power plant.

Plaintiff B&W subcontracted with Defendant Hitachi for the design and supply of this catalyst. Negotiations as to the precise terms of the contract between the parties began some time in June 1999 and continued well into the following year. During this time, the parties sent several proposals or similar communications to each other, as described below. The parties dispute what interpretation the Court should attach to the communications. Specifically, each party claims that the B&W-Hitachi contract arose at a different point during the negotiations. As a result, the parties disagree on the precise terms of the contract, specifically as relates to the applicable performance guarantee, warranty, and remedy provisions.

B&W first contacted Hitachi near June 28, 1999, when it issued a Request for Quotation to Hitachi and another vendor for the design and supply of the catalyst for the SCR system. On July 9, 1999, Hitachi responded, sending B&W a partially completed proposal. The proposal included a B&W bid form and an initial version of a document entitled "Technical Specification for SCR $NO_x$ Removal System." In the following months, Hitachi sent B&W several revised proposals.[1]

Most relevant to the instant matter is Hitachi's December 9, 1999 proposal. This proposal consisted of a one-page cover letter, dated December 9, 1999 ("Hitachi Price Quotation"), and a

---

[1] Hitachi apparently sent various proposals in July, August, September, October, and November of 1999.

-2-

Case No. 5:05-cv-00047
Gwin, J.

revised technical specification, dated December 8, 1999 ("BHK Specification").  Hitachi maintains

that this proposal was an offer that B&W later accepted with its June 15, 2000 purchase order.  In

contrast, B&W claims the proposal was merely one communication in a series of initial negotiations.

The Hitachi Price Quotation lists a price for the catalyst, as well as a proposed delivery date

and payment terms.  Hitachi expressly limited the validity of the quote until December 10, 1999.

After that time, it was subject to Hitachi's confirmation.

Paragraph 6 of the quote sets forth a general performance guarantee, and then states the

following with regard to certain terms and conditions that B&W had earlier proposed:

> c.      Comments to the terms and conditions are as follows:
> > i.      Article 15, We would like to substitute the attached warranty clause.
> > ii.      Article 29.14, We would like this article deleted.  We are a subcontractor supplying only catalyst and no service is being provided.
> > iii.      We would also like to add the attached limitation of liability, proprietary rights, patent indemnity, etc. as they are not address [sic] in the terms and conditions provided.

Finally, the quote concludes, "If you have any question [sic] or comments after reviewing this

quotation please contact us."

In accordance with its comments, Hitachi attached to the quote the proposed warranty,[2]

---

[2] Hitachi's proposed warranty stated as follows:

     i) Notwithstanding expiration or termination of this Agreement, Contractor warrants that for a period of twelve (12) months from the date of this Agreement or eighteen (18) months from the arrival date of the catalyst at the job site, whichever is shorter, the Equipment (a) will be free from defects in material and workmanship, and, [sic] (b) will comply with the specifications in all material respects.  These warranties do not cover the results of wear and tear, corrosion, accident, abuse, neglect, vandalism, act of God, or the installation, use, repair or modification contrary to specifications or instructions supplied by Contractor, including the conditions set forth within Contractors [sic] specification.

     ii) <u>Remedies for Nonconformance with Warranty</u>.  If the equipment does not conform with the foregoing warranties, in accordance with and following the procedures outlined in Contractors [sic] specification, owner shall notify Contractor of the defect.  Contractor, at its option, will add, repair or replace the Equipment or the defective component thereof free of charge.

(continued...)

-3-

Case No. 5:05-cv-00047
Gwin, J.

indemnification, and limitation of liability terms,[3] as well as the BHK Specification.  Aside from

describing the catalyst properties, the revised specification also includes a detailed "Performance

Guarantee and Mechanical Warranty" ("BHK Performance Guarantee").  This guarantee runs about

two and a half pages.  It first refers to a table outlining the standards of catalyst performance that

Hitachi will guarantee.  It then sets forth the conditions that B&W must meet, such as plant

operation standards, in order for the guarantee to apply.  Near the end of the guarantee, Hitachi

includes a paragraph limiting its liability in the event of performance failure.  This section appears

as follows:

> (14) Non-fulfillment of guarantee of catalyst
> Should the Catalyst fail to meet the performance guarantee within the period
> and should its liability on Hitachi/BHK be proven, Hitachi/BHK will take
> necessary countermeasures to meet the performance guarantee such as addition,
> the following steps shall be taken:
> 1) The purchaser shall prove by recorded operational data that the plant has
> been operated in accordance with the instructions submitted by Hitachi/BHK
> after award.

---

[2](...continued)
    iii) <u>Disclaimer of Warranty</u>.  THE FOREGOING WARRANTIES ARE THE SOLE AND
EXCLUSIVE WARRANTIES GIVEN BY CONTRACTOR IN CONNECTION WITH THIS
AGREEMENT, EXPRESS OR IMPLIED, AND CONTRACTOR DISCLAIMS ALL IMPLIED
WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND
FITNESS FOR A PARTICULAR PURPOSE. CONTRACTOR DOES NOT PROMISE THAT THE
EQUIPMENT IS ERROR-FREE OR WILL OPERATE WITHOUT INTERRUPTION. The liabilities
set forth in this Purchase Order constitute the entire liability of the Contractor with respect to the
Equipment, whether in contract, tort (including negligence), warranty, strict liability, or any other legal
theory, and Contractor's obligation to correct defects, whether latent or patent, in the Equipment shall
be limited to defects discovered during the warranty period specified in this Clause.

[3] Hitachi's proposed "Limitations of Liability" clause stated as follows:
    (a) Neither party will be liable to the other for any special, incidental, or consequential
damages, even if informed of the possibility thereof in advance.  These limitations apply to all causes
of action in the aggregate, including without limitation breach of contract, negligence, strict liability,
fraud, misrepresentation and other torts or other causes of action.
    (b) In no event will either party be liable to the other for any liability in connection in an
amount exceeding __ percent of the purchase price in the aggregate (the "dollar limitation").
    (c) The dollar limitation contained in this article shall not apply to for [sic] non-payment of
any sum due under this contract.

-4-

Case No. 5:05-cv-00047
Gwin, J.

> 2) The purchaser shall first investigate the cause of non-fulfillment of guarantees.
> 3) Hitachi/BHK has the right to obtain all information available on operation of the plant, and has the right to review/advise of the purchaser's corrective work.
> 4) In case that the liability on the part of Hitachi/BHK is proven and catalyst supply is required, Hitachi/BHK shall supply required extra catalyst at the designated point by the original contract to achieve the performance guarantee within the guaranteed period.  Even in this case, Hitachi/ BHK responsibility shall be limited within the scope of supply and Hitachi/BHK's maximum liability shall be equal to the contract price of the catalyst initially charged.  In connection with the above, Hitachi/BHK shall not be liable in any event for loss of anticipated profit, loss due to plant shut-down, non-operation or increased expense of operation or of other equipment, or other consequential loss or damage of any nature arising from any cause whatsoever.
> 5) Hitachi/BHK has the right to be present at the repeated performance test of the plant.
> In the [sic] connection with the above, Hitachi/ BHK shall not be liable in any event for loss of anticipated profit, loss due to plant shut-down, non-operation, or increased expense of operation of other equipment, or other consequential loss and damage of any nature arising from any cause whatsoever.

Responding to the December 9, 1999 proposal, B&W sent a "Letter of Intent" to Hitatchi. B&W claims this communication "confirm[ed] the intent of Babcock & Wilcox to enter into a contract with Hitachi."[4] The letter identified certain terms that the parties had allegedly agreed upon and other terms that remained open.  In the section listing the open terms, B&W wrote, "Terms & Conditions: B&W to provide a response to Hitachi America's comments," apparently referring to Hitachi's proposed warranty and limitation of liability terms.  Hitachi signed this letter on December 29, 1999, and indicated that it "agree[d] to the open issues."[5]

Throughout the first five months of 2000, the parties continued to negotiate various terms, including the price of the catalyst.  Finally, in May 2000, the parties agreed upon a final price of

---

[4] Mark Rohner Aff. ¶ 11, Sept. 26, 2005.

[5] Letter from David Brozek, Hitachi America Ltd., to Mark Rhoner, Babcock & Wilcox 1 (Dec. 29, 1999).

Case No. 5:05-cv-00047
Gwin, J.

$2,300,000 for the catalyst.

Following this agreement, on June 15, 2000, B&W issued a detailed purchase order ("Purchase Order") for the catalyst.  B&W contends that this document was an offer rather than an acceptance.  In support, it points to language appearing at the start of the "Terms and Conditions" section that refers to the Purchase Order as an offer and sets forth means of acceptance.  Specifically, under the heading, "Acceptance," the Purchase Order states:

> (a) This order is Buyer's offer to Seller and does not constitute an acceptance by Buyer of any offer to sell, quotation or proposal.  Any reference to such offer to sell, quotation or proposal is solely for the purpose of incorporating the description and specifications of the goods and services contained therein to the extent that such description and specifications do no [sic] conflict with the description and specifications on the face of this order. This order consists only of the terms contained herein and on the face of this order and any supplements, specifications or other documents expressly incorporated herein by reference.
> (b) By acknowledging receipt of this order (or by shipping the goods or performing the services called for by this order) Seller agrees to the terms or conditions of sale contained in this order.  Any additional or different terms or conditions contained in any acknowledgment of this order by Seller shall be deemed objected to by Buyer without need of further notice of objection and shall be of no effect nor in any circumstance binding upon Buyer unless accepted by Buyer in writing.  Acceptance or rejection by Buyer of any such additional terms or conditions shall not constitute an acceptance of any other additional term or condition.

Hitachi maintains that the "Terms and Conditions" referenced above are merely form language, appearing on the seventh and last page of the Purchase Order.  Hitachi further claims that the true intent of the parties was that the Purchase Order constitute an acceptance of Hitachi's December 9, 1999 proposal.  As a result, Hitachi claims that the terms and conditions relating to warranty and performance guarantee that it proposed in the December 9 letter are controlling.

Indeed, the B&W Purchase Order does reference the Hitachi Price Quotation and revised BHK Specification.  The first page of the Purchase Order provides:

Case No. 5:05-cv-00047
Gwin, J.

> This purchase order is governed by the terms and conditions contained herein and
> incorporates by reference the documents listed below to form the complete contract
> between B&W and Seller.  Any clarifications and/or exceptions made by Seller in
> any form prior to the issuance of this order are of no force and effect except as
> incorporated herein.  If a conflict is discovered to exist between or among separate
> provisions of the documents, B&W and Seller agree to resolve such conflicts by
> application in the following order of precedence:
> REFERENCE DOCUMENTS:
> 1. DENOX CATALYST SPECIFICATION DATED SEPT. 9, 1999
> 2. LETTER OF INTENT DATED DEC. 23, 1999
> 3. BABCOCK-HITACHI TECHNICAL SPECIFICATION EL-Q99-N-019 REV. G
> DATED DEC. 8, 1999 and QUOTATION NEVQ-5786 REV. F DATED DEC.9,
> 1999.

Additionally, the Purchase Order specifically incorporates the BHK Performance Guarantee, which

appears in the December 8 BHK Specification, as the applicable performance guarantee and remedy

provision.[6]

However, the Purchase Order sets forth at least two additional warranties.  First, it describes

a warranty relating to year-2000 compliance.  Next, and more importantly, the "Terms and

Conditions" of the Purchase Order contain a broad-ranging warranty.  This provision includes an

express warranty of fitness for a particular purpose:

> WARRANTY.  Seller expressly warrants that all goods and/or services to be
> supplied hereunder shall conform to the specification, drawings, samples or other
> description upon which this order is based, shall be fit and sufficient for the purpose
> intended, merchantable, of good material and workmanship and free from defect and
> that goods and services of Seller's design will be free from defect in design.  Seller
> agrees to warrant the goods and/or services for one (1) year from installation or
> eighteen (18) months after shipment, whichever occurs first.  Inspection, test,
> acceptance and use of the goods furnished hereunder shall not affect Seller's
> obligation under this warranty and such warranty shall survive inspection, test,
> acceptance and use.  This warranty shall run to Buyer, its successor, assigns, and
> customers and the user of its product.  Seller agrees to replace or correct defect
> (including labor and transportation) in any goods or services not conforming to the

---

[6] The Purchase Order states, "Performance Guarantees and Remedies will be as defined in Babcock Hitachi
K.K. Technical Specification dated Dec. 8, 1999."

Case No. 5:05-cv-00047
Gwin, J.

> foregoing warranty promptly, without expense to Buyer, when notified by Buyer of
> such nonconformity by buyer.  In the event of failure by Seller to correct defects in
> or replace nonconforming goods or services promptly, Buyer, after reasonable notice
> to Seller, may make such corrections or replace such goods and services and charge
> for the costs incurred by Buyer thereby.

In contrast to the section from the BHK specification describing the performance guarantees, this warranty provision contains no corresponding limitation on the remedy or liability.

After receiving the B&W Purchase Order, Hitachi apparently reviewed the terms of the order.  According to B&W, Hitachi neither objected to nor raised any concern about the terms and conditions stated in the Purchase Order.  In response, Hitachi points out that it did not sign the acknowledgment form that accompanied the Purchase Order.  However, it is apparently the general practice of Hitachi not to sign such forms.[7]  Irregardless, Hitachi did ship the goods requested under that Purchase Order sometime during the latter half of 2001.

Subsequently, B&W experienced trouble with the SCR system, allegedly stemming from either a catalyst defect or an insufficient supply of catalyst.  When Hitachi refused to provide extra catalyst, B&W had to turn to an outside vendor.  B&W now sues Hitachi for its alleged failure to provide catalyst conforming to Hitachi's proffered performance guarantees. The Court does not, however, at this point deal with Hitachi's actual liability, if any.  Rather, the Court's present task is to discern the nature and scope of the contract between B&W and Hitachi

## <u>LEGAL STANDARD</u>

Summary Judgment is appropriate where the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court enters summary judgment "against a party who fails to

---

[7] David Brozek dep. 202-06.

Case No. 5:05-cv-00047
Gwin, J.

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that show the absence of a genuine issue of material fact. *Id.* at 323. A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-moving party cannot avoid summary judgment by resting on its pleadings or reasserting its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court views the factual evidence and draws reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). The Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal punctuation omitted). "The mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

Case No. 5:05-cv-00047
Gwin, J.

find for the plaintiff." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (citation and internal punctuation omitted).

### **DISCUSSION**

Neither party in the instant matter disputes the existence of a contract between B&W and Hitatchi.  Instead, their dispute lies in the nature and scope of this contract.  Hitachi maintains that the terms and conditions contained in its Price Quotation and BHK Specification, are controlling.  According to Hitachi, these documents together formed the offer and B&W's Purchase Order operated as an acceptance of this offer.  To the extent that B&W's Purchase Order contained inconsistent terms, the parties find themselves locked in a "battle of the forms" to be resolved by application of § 2-207 of the Uniform Commercial Code (codified in Ohio as Ohio Rev. Code § 1302.10).

In the alternative, Hitachi argues that even if the Court finds B&W's Purchase Order to represent the offer, the terms of the December 9, 1999 proposal are still controlling because the Purchase Order directly incorporates them as part of the contract.

In contrast, B&W contends that its Purchase Order represented the offer and that Hitachi accepted that offer by shipping the catalyst.  Therefore, B&W argues that there is no battle of the forms and the terms set forth in the Purchase Order are controlling.  Further, B&W argues that while the Purchase Order does incorporate the December 9, 1999 letter from Hitachi, it does not incorporate the suggested warranty and limited liability clauses that Hitachi attached to that letter.

To resolve these issues, the Court first addresses the formation of the contract, determining which communications amount to offer and acceptance.  The Court then turns to the actual terms of the contract.

-10-

Case No. 5:05-cv-00047
Gwin, J.

As discussed below, the Court ultimately finds that the December 9, 1999 proposal was not an offer and does not represent the B&W-Hitachi contract. Instead, the B&W Purchase Order, issued six months after the December 9, 1999 proposal, constitutes the offer and memorialization of the contract. The Court also finds that the contract specifically incorporates by reference the December 8, 1999 BHK Performance Guarantee, which by its own terms includes a limitation of remedy and of liability. Finally, the contract also includes an express warranty embodied in paragraph 11 of the terms and conditions of the B&W Purchase Order as well as an implied warranty of fitness for a particular purpose.

I.      The Formation of the B&W-Hitachi Contract

The parties agree that the Court must resolve the present dispute through application of the Ohio version of the Uniform Commercial Code, Ohio Rev. Code § 1302.01, *et seq.*[8] Hitachi relies on section § 1302.10 for interpretation of the contract.[9] Section 1302.10 provides certain rules of construction to address the problem known as the "battle of forms" where a contract exists but the forms constituting the offer and acceptance contain different terms. Thus, unless the Court first finds an offer and acceptance containing conflicting terms, § 1302.10 has no application. *See*

---

[8] The contract at issue here is one for the manufacture and sale of a complex component of a piece of machinery. The Code applies to contracts for the sale of such goods, as set forth in Ohio Rev. Code § 1302.02. *See also Mead Corp. v. McNally-Pittsburg Mfg.*, 654 F.2d 1197, 1199 n. 1 (6th Cir. 1981).

[9] Ohio Rev. Code § 1302.10 states in relevant part:
(A) A definite and seasonable expression of acceptance or a written confirmation that is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(B) The additional terms are to be construed as proposals for addition to the contract. Between merchants, the terms become part of the contract unless one of the following applies:
(1) The offer expressly limits acceptance to the terms of the offer.
(2) They materially alter it.
(3) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

-11-

Case No. 5:05-cv-00047
Gwin, J.

*Mantaline Corp. v. PPG Industries, Inc.*, No. 97-4473, 2000 WL 799337, at **4 (6th Cir. June 8,

2000) (quoting *Litton Microwave Cooking Prods. v. Leviton Mfg. Co., Inc.*, 15 F.3d 790, 794 (8th

Cir.1994)) ("'For a 'battle of the forms' to arise and trigger the provisions of § 2- 207, there must

be conflicting forms to begin with, each of which satisfies the common-law or statutory

requirements for an offer. If the first form is not an offer, there can be no battle.'").

        Defendant Hitachi claims that its December 9, 1999 proposal amounted to an offer that

Plaintiff Babcock accepted through the June 15, 2000, B&W Purchase Order.  Babcock argues

instead that Hitachi's December 9 proposal was a mere price quotation transmitted during ongoing

negotiations and never became the core of the parties agreement.

        Ohio courts define an offer as a "manifestation of willingness to enter into a bargain, so made

as to justify another person in understanding that his assent to that bargain is invited and will

conclude it."   *Leaseway Distribution Ctrs., Inc. v. Dep't of Admin. Services*, 49 Ohio App.3d 99,

550 N.E.2d 955, 961 (1988) (quoting Restatement (Second) of Contracts §  24 (1981)).  The Sixth

Circuit has stated that a price quotation typically "'is considered an invitation for an offer, rather

than an offer to form a binding contract.'" *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567,

572 (6th Cir. 1999) (quoting *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190

(8th Cir.1999)).  *See also Mecanique C.N.C., Inc. v. Durr Environmental, Inc.,* 304 F. Supp.2d 971,

979 (S.D. Ohio 2004); *L.B. Trucking Co., Inc. v. C.J. Mahan Const. Co.*, No. 01AP-1240, 2002 WL

1969645, at *3 (Ohio App. Aug 27, 2002).  Along these same lines, it is most often the buyer's

purchase order, submitted in response to such a quotation, that constitutes the offer.  *Dyno*

*Construction Co.*, 198 F.3d at 572. *See also Tlg Electronics, Inc. v. Newcome Corp.*, No. 01AP-821,

2002 WL 338203, *2 (Ohio App. 2002) (Generally, the submission of a purchase order may be

Case No. 5:05-cv-00047
Gwin, J.

deemed an offer to be accepted or rejected by the seller.).

There are situations where courts find that a price quotation is sufficiently detailed as to amount to an offer.  The inclusion of items such as a "description of the product, price, quantity, and terms of payment may indicate that the price quotation is an offer rather than a mere invitation to negotiate." *Dyno Construction Co.*, 198 F.3d at 572.  However, "the determination of the issue depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances."  *Id*.

Thus, for example, in *Dyno Construction Co.*, the Sixth Circuit held that the defendant seller's price quotation for iron pipe and fittings was not an offer and that no contract was formed when the plaintiff buyer told the defendant to order the requested pipe.  *Id*. at 573-74.  The court focused on the fact that the price quote contained words such as "estimate" and "please call," stating that these expressions indicated intent to engage in further negotiations.  *Id*. at 574.  Additionally, the quotation stated nothing about the terms of payment, place of delivery, or time of performance, though it did include a description of the materials, prices, and quantities. *Id*.

In holding as such, the Sixth Circuit cited *Interstate Industries, Inc. v. Barclay Industries, Inc.*, 540 F.2d 868 (7th Cir.1976), where the court found that the defendant's letter that stated that the defendant could produce fiberglass panels at specified prices in accordance with the plaintiff's standards was not an offer.  Like the letter in *Dyno Construction Co.*, this letter lacked payment terms and time of delivery.  It also stated nothing about quantity and employed the term "price quotation." *Id.* at 873.

Similarly, in *Mecanique C.N.C., Inc.*, the plaintiff sent a letter to the defendant containing a price quotation for the fabrication and installation of duct work in an SCR system comparable to

-13-

Case No. 5:05-cv-00047
Gwin, J.

the system involved in the present case. 304 F. Supp.2d at 973. There, the United States District

Court for the Southern District of Ohio held that the letter did not constitute an offer because, among

other reasons, it lacked certain details such as terms of payment and time of performance. *Id.* at 980.

Additionally, the Court found that the letter's closing statement, "Hoping the above meets your

entire satisfaction....," indicated that the plaintiff intended the letter only to encourage further

negotiations rather than result in a binding contract. *Id.* at 979-80.

In contrast to the cases described above, the Sixth Circuit has under certain circumstances

held that a price quotation constituted an offer. In *Mead Corp. v. McNally-Pittsburg Mfg.*, 654 F.2d

1197 (6th Cir. 1981), the plaintiff buyer solicited bids from several manufacturers for the

construction of a coal washing plant, sending each manufacturer a bid package containing technical

bid specifications an general conditions. In response, the defendant seller sent a bid proposal. The

proposal contained a description of the offered price and delivery schedule for the project, as well

as several noted exceptions to the conditions the buyer listed in its bid package. Specifically, the

defendant proposed its own terms regarding limitation of liability. The parties continued

negotiations, resolving all issues except for limitation of liability. Subsequently, the plaintiff sent

a purchase order to the defendant. The purchase order explicitly incorporated the terms and

conditions of the defendant's proposal, but also stated in form language that the purchase order was

an offer and was governed only by the terms contained within the order.

The court ultimately found that the defendant's bid proposal, rather than the plaintiff's

subsequent purchase order, constituted the offer. It cited the fact that the plaintiff determined, upon

receiving the defendant's proposal, to deal with the defendant as the desired manufacturer. *Id.* at

1203-04. Moreover, the plaintiff issued the purchase order "upon the heels of the negotiations"

-14-

Case No. 5:05-cv-00047
Gwin, J.

regarding the bid proposal, and the word "confirmation" appeared in all capital letters on page two of the purchase order.  Additionally, the court noted that because the purchase order incorporated the terms and conditions of the defendant's proposal, the purchase order indicated assent to those terms.  *Id.*

In all of the above cases, with the exception of *Mead*, the courts focused on the appearance and contents of the price quotation itself in order to ascertain the parties' intentions.  More specifically, these courts looked at factors such as what terms were included, whether there was language on the quotation evincing the intent that it form an offer, or along the same lines whether there was language suggesting the quote was a mere communication in an ongoing negotiation.  Notably,  in *Mead*, the Court placed less focus on the details of the price quotation and increased focus on the actions of the parties in relation to the documents.  Still, just as in the other cases, the court's ultimate focus appears to have been the intention of the parties.  Essentially, in each case, the court must look to the totality of the circumstances to ascertain this intent.  *See id.* at 1203.

In this case, Defendant Hitachi relies heavily on the Sixth Circuit's holding in *Mead*, arguing that the facts of that case are almost identical to the facts currently before the court.  Indeed, the cases are similar in skeletal frame.  Just as occurred in *Mead*, here B&W sent Hitachi a bid package containing certain product specifications, as well as detailed terms and conditions.  After several months of communications, Hitachi sent the December 9, 1999 proposal.  Like the letter at issue in *Mead*, Hitachi's letter also contained proposed warranty and limitation of liability terms.  B&W responded to this proposal with an expression of intent to purchase the catalyst from Hitachi, and thereafter the parties continued to negotiate the specific contract terms.

The Court additionally notes that Hitachi's December 9, 1999 proposal, consisting of the

-15-

Case No. 5:05-cv-00047
Gwin, J.

Price Quotation and the BHK Specification, was fairly detailed.  As described above, the revised BHK Specification contained a lengthy description of the catalyst and of certain performance guarantees.  Rounding out these specifications, the Price Quotation includes a quoted price of $2,488,117 for the catalyst, the date of delivery, a description of payment terms, and a statement that the quote would be valid for one day and would thereafter be subject to Hitachi's confirmation.  These aspects of the quote tend to weigh in favor of Hitachi's argument that it amounted to an offer.

However, the Court finds that despite the detailed nature of the proposal and the similarities between *Mead* and the present case, there are important facts in this case showing that the intentions of the parties were that Hitatchi's December 9, 1999 proposal was merely an invitation for further negotiation.  First, the language of the December 9 letter indicated that the it called for further negotiation.  Specifically, the correspondence is labeled a "price quotation" and closes with the statement, "If you have any questions or comments after reviewing this quotation please contact us."  Consistent with the tone of this letter, the parties engaged in further negotiations for a period of six months after Hitachi issued the proposal.

Moreover, the letter's proposal of additional terms, including warranty and limitation of liability clauses is phrased in such a manner as to indicate the terms are far from firm, but rather are suggested for inclusion in a future contract.  Hitachi does not simply include these terms as part of the price quote, but rather references them in a "comments" section, stating, "[w]e *would also like to* add the attached limitation of liability . . ."and "[w]e *would like to* substitute the attached warranty clause" (emphasis added).  The clauses thus operate as a starting point for negotiations rather than as terms of the proposal.

Additionally, B&W's response to the proposal, sent on December 23, 1999 and signed by

-16-

Case No. 5:05-cv-00047
Gwin, J.

Hitachi on December 29, 1999, indicated that while B&W intended to eventually enter into a contract with Hitachi, B&W still considered the parties to be in negotiations at that point.[10]  B&W states in that letter that the parties had reached agreement as to pricing, terms of payment, date of delivery, and performance guarantees.  The letter further states that the parties had yet to reach agreement on, among other issues, the terms and conditions of the contract and liquidated damages.  The letter then called for Hitachi to "indicate the earliest date after January 3, 2000 [it had] available to discuss and finalize the above open issues," and "confirm Hitachi America's agreement to proceed with engineering per this letter of intent while a mutually acceptable agreement is negotiated on the open issues."

A representative from Hitachi, David Brozek, signed B&W's December 21 letter.  In transmitting the signed copy to B&W, Brozek stated in the cover letter that Hitachi agreed to the "open issues."  After this communication, the parties engaged in six more months of negotiations, during which time they not only discussed the open issues but also renegotiated the price of the catalyst.  This is evident in that on May 10, 2000, Hitachi sent B&W yet another quotation, albeit much less detailed, stating $2,070,000 as the price of the catalyst.  Ultimately, the B&W Purchase Order stated yet another price, $2,300,000, for the catalyst.

In addition to this evidence, the B&W Purchase Order itself further bolsters B&W's position that the December 9, 1999 proposal was a price quotation, and that the Purchase Order constitutes the actual offer.  The Purchase Order contains a complete and apparently final statement of all of the terms, providing a detailed description of the catalyst quantity, price, payment terms, delivery

---

[10] The Court notes that even if it did find Hitachi's December 9, 1999 proposal to be an offer, the time to accept that offer was expressly limited to December 10, 1999.  B&W did not respond until nearly two weeks later.  At that point, the alleged offer would have been inoperable.

Case No. 5:05-cv-00047
Gwin, J.

specifications, and various other terms.  In addition to the standard boilerplate terms and conditions appearing on page seven of the Purchase Order, it also references certain additional warranties and performance guarantees.  Moreover, the Purchase Order explicitly states that it is an offer and that Hitachi's acceptance is conditioned on the terms stated therein.  While such language is not controlling, it is some evidence of the parties' intentions.  *See Mead*, 654 F.2d at 1203 (stating that while such language is not dispositive of the parties' intentions, the court looks to the totality of the circumstances).  Unlike the purchase order in *Mead*, which contained similar boilerplate language, there is nothing on the B&W Purchase Order, such as the word "confirmation," that would indicate the boilerplate language is not applicable.

Finally, the Court notes that while the parties engaged in months of additional negotiations after Hitachi issued the December 9, 1999 letter, the parties apparently ceased negotiations after B&W issued the Purchase Order.  The mere fact that the parties engaged in such extensive negotiations during that period, involving not only issues of warranty and liability, but also the more basic issue of catalyst price, shows the December 9, 1999, letter was nothing more than one of several communications sent for the purpose of negotiating a future agreement.  Similarly, the fact that negotiations ceased after B&W issued the Purchase Order shows the parties viewed this document to be the true memorialization of the parties' contract.

The Court thus finds the totality of the circumstances indicate that neither party intended the December 9, 1999 price quotation to constitute an offer.  Instead, the intention of the parties appears only to have been to continue negotiations until a mutually acceptable agreement could be forged.  Furthermore, the Court finds that the B&W Purchase Order constituted the offer and that Hitachi accepted this offer by shipping the goods pursuant to the explicit instructions of the Purchase Order

-18-

Case No. 5:05-cv-00047
Gwin, J.

regarding method of acceptance.

II.      The Terms of the B&W-Hitachi Contract

Having found that the B&W Purchase Order represents the contract between the parties, the Court now turns to the question of what terms comprise that contract.  Contrary to Defendant Hitachi's assertion, the Court does not resolve this issue through application of Ohio Rev. Code § 1302.10, as the Court has found no battle of the forms.  Instead, the Court's task is to decipher the meaning of the terms appearing on the face of the B&W Purchase Order, as well as the terms incorporated by reference within the Purchase Order.

The parties dispute centers around which of the various warranty, limitation of liability, and performance guarantee provisions discussed above are controlling.  In its complaint, B&W rests its claims on the warranty provision appearing in the terms and conditions section of the Purchase Order, as well as paragraph 4.2 of the September 9, 1999 catalyst specification ("Denox Specification").  Paragraph 4.2 of the Denox Specification deals with performance guarantees, setting forth specific guarantees as well as remedies and liquidated damages.

In its motion for partial summary judgment, Hitachi claims that even if the court finds that its December 9, 1999, proposal was not an offer, the performance guarantees, warranty, and limitation of liability terms set forth in that proposal are still controlling.  Hitachi bases this claim on the fact that the B&W Purchase Order incorporates both the Price Quotation and the BHK Specification in which these terms appear.

Responding, B&W admits that the performance guarantees set forth in the BHK specification, as opposed to those set forth in the Denox Specification, form part of the contract. However, B&W argues that the separate warranty and limitation of liability provisions that Hitachi

-19-

Case No. 5:05-cv-00047
Gwin, J.

proposed in its December 9, 1999 letter were never incorporated as actual terms of the contract.  As

such, B&W claims the only additional express warranties are those included on the face of the B&W

Purchase Order – specifically, the warranty regarding year 2000 compliance and the general

warranty included in the terms and conditions section.

Were the Court dealing only with the terms on the face of the Purchase Order, this matter

would be infinitely less complicated.  However, as discussed above, the Purchase Order incorporates

by reference at least 4 other documents.  In order of importance, the Purchase Order lists these

documents as (1) the Denox Specification, (2) the December 23, 1999 letter of intent from B&W,

and (3) the BHK Specification and Hitachi's December 9, 1999 Price Quotation.[11]

The parties appear to pick and choose warranty terms from these documents as best suits

their needs.   However, the Purchase Order specifically states that if conflicts arise between

provisions appearing in those documents, the conflicts are to be resolved according to the hierarchy

of importance set forth above.  The Purchase Order is also, necessarily, part of this hierarchy, it

trumps the other three documents as the main instrument setting forth the terms of the contract.

Thus the Court looks first to the express terms of the Purchase Order.  If a conflict or inconsistency

arises on the face of the Purchase Order, the Court must then turn to the remaining documents for

guidance.

A.      *Performance Guarantees*

With regard to the performance guarantees, the Purchase Order states in a separate section

entitled "Performance Guarantees" that "Performance Guarantees and Remedies will be as defined

---

[11] Purchase Order at pg.

Case No. 5:05-cv-00047
Gwin, J.

in [BHK] Specification dated December 8, 1999."[12/]  Moreover, the parties appear to agree that this

performance guarantee controls.  As such, even though the Denox Specification lies first in order

of the documents the parties are to consult in the case of a conflict, it does not effect the express

adoption of the performance guarantee from the BHK Specification.  In other words, paragraph 4.2

of the Denox specification is not relevant to the parties' dispute.

> B. *Express Warranties and Limitations of Liability*

Aside from the BHK Performance Guarantee, which itself contains both specific warranties

regarding catalyst performance as well as clauses limiting the remedies and liability in relation to

sub-standard performance, the parties also argue that certain additional general warrantees are

included in the contract.  Hitachi argues that the contract incorporates by reference the proposed

warranty and limitation of liability clauses appearing in Hitachi's December 9, 1999 Price

Quotation.  In contrast, B&W argues that the controlling general warranty is found in paragraph 11

of the terms and conditions of the Purchase Order.

The Court first finds that the independent warranty and limitation of liability terms attached

to the Hitachi Price Quotation are not part of the contract.  While the B&W Purchase Order does

incorporate the quotation, it appears to do so only to the extent that it serves as a reference to resolve

any conflicts arising from the terms of the Purchase Order.  In contrast, the Purchase Order not only

incorporates the BHK Specification generally, but also specifically references and adopts the section

BHK Performance Guarantee.  It stands to reason that if B&W intended to similarly incorporate the

warranty and limitation of liability clauses suggested in the price quotation, the Purchase Order

would have explicitly stated as such.

---

[12/] Purchase Order at pg. 4.

Case No. 5:05-cv-00047
Gwin, J.

Moreover, the Hitachi Price Quotation is the last in the hierarchy of documents that the Purchase Order lists as sources to be used for clarification of the contract.  The December 23, 1999 letter of intent, in which B&W indicates an unwillingness to accept the suggested warranty and limitation of liability terms, takes higher precedence.  Hitachi presents no evidence that B&W's position on the matter changed prior to issuing the Purchase Order.  Additionally, as discussed above, the Purchase Order itself evinces no intention of incorporating those specific terms.

Finally, the Court finds that the terms of the Price Quotation are incomplete.  The limitation of liability suggested in the letter specifically leaves blank the amount by which liability will be limited.  The  parties show no evidence of ever reaching agreement on any particular amount and the B&W Purchase Order mentions no such limitation.  As discussed above, the language Hitachi uses in offering these clauses as potential terms is language of negotiation.  The terms were merely starting points, and both parties understood their inclusion in the final contract to be an open question.  The parties answered this question by failing to expressly adopt these terms as they had adopted other terms, such as the BHK Performance Guarantee.

In contrast, the Court finds that the B&W-Hitachi contract does include the general warranty provision appearing in paragraph 11 of the terms and conditions enumerated in the B&W Purchase Order. Hitachi argues that paragraph 11 has limited force.  Specifically, it argues that Hitachi argues that because the BHK Performance Guarantee sets forth specific, detailed warranties and limitations of liability, it overrides the general warranty appearing in paragraph 11. The BHK Performance Guarantee, though similar to a warranty of fitness for a particular purpose, does not completely eclipse the general warranty in paragraph 11 of the Purchase Order.  Hitachi itself suggested that the contract include an independent general warranty and limitation of liability clause in its December

-22-

Case No. 5:05-cv-00047
Gwin, J.

9, 1999 proposal.  Moreover, both parties claim to have negotiated these terms between December 1999 and June 2000, when B&W issued the Purchase Order.  As such, the Court can only assume that the parties intended all along to include both the specific performance guarantees as well as a more general warranty.

That said, Hitachi now argues that according to the principle of contract construction that specific terms are given greater weight than general language, the Court should give greater weight to the more specific BHK Performance Guarantee.  *See* Restatement (Second) of Contracts § 203(c) (1981).  This principle only applies, however, where the court is unable to construe the intentions of the parties.  *See id.* § 203 cmt. a ("The rules of this Section . . . do not override evidence of the meaning of the parties, but aid in determining meaning or prescribe legal effect when meaning is in doubt.").

The Uniform Commercial Code echoes this position.  Ohio's version of the Code provides that when faced with the accumulation of conflicting warranty provisions, "[w]arranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant." As discussed above, there is sufficient evidence in the present case to conclude that the parties intended to include both the specific performance guarantees and the broader implied warranty.

At the present time, however, there is insufficient evidence for the Court to conclude what the two parties intended as far as the precise application of the two warranties.  The remedy and limitation of liability clauses contained in the section on performance guarantees appear specific to those enumerated guarantees, rather than broadly applicable to all of the warranties contained in the

-23-

Case No. 5:05-cv-00047
Gwin, J.

Purchase Order.   However, because of the dearth of evidence regarding the parties' intentions as to the scope of these provisions, the determination of this matter will have to await trial.[13]

     *C.*     *Implied Warranty*

     As a final matter, Hitachi also argues that the limited remedy and liability clauses in the BHK Performance Guarantee operates to disclaim the implied warranty of fitness for a particular purpose. Thus far, the Court has found that the B&W-Hitachi contract includes both the general warranty provision that appears on the face of the Purchase Order as well as the BHK Performance Guarantee that is specifically incorporated by reference as a term of the Purchase Order.  The Court must now decide whether the contract contains an additional implied warranty or whether certain portions of the BHK performance Guarantee operate to disclaim that warranty.

     In general, courts have usually viewed specific express warranties, such as the one relating to performance guarantees in this case, as separate and independent from the implied warranty of fitness for a particular purpose.  *See Ressallat v. Burglar & Fire Alarms, Inc.*, 79 Ohio App. 3d 43, 606 N.E.2d 1001 (Ohio App. 1992); *Klein v. Sears Roebuck and Co.*, 773 F.2d 1421, 1424 (4th Cir. 1985);  *Kaiser Cement & Gypsum Corp. v. Allis-Chalmers Mfg. Co.*,  35 Cal. App.3d 948, 959, 111 Cal.Rptr. 210, 217 (Cal. App. 1973) ("breach of the warranty to repair is separate and independently

---

[13] The Court notes several issues that the parties alluded to in their motions for partial summary judgment, but apparently chose to save for argument at trial.  These issues include for example the interpretation of the limited remedy provisions attached to the performance guarantees, and specifically of the requirement that B&W must "prove" that any performance problem of the SCR system is attributable to a defect in the catalyst before Hitachi would be required to replace or repair the catalyst.  Hitachi appears to suggest this would require B&W to prove Hitachi's liability in court before Hitachi becomes bound to repair the defect.  Though not presently at issue, the Court notes that the remedy provision is by no means clear as to what the standard of actual proof B&W must meet or what procedure B&W must follow before it has met it's burden.

     Additionally, Hitachi suggested the possibility that B&W will argue that the remedy and limitation of liability clauses in the section on performance guarantees failed of their essential purpose.  *See* Ohio Rev. Code § 1302.93(c). As neither party developed this issue at the summary judgment state, it also must await resolution at trial.

Case No. 5:05-cv-00047
Gwin, J.

actionable from other warranties, such as those here relating to the temperature rise, fitness, merchantability and quality").  Because the B&W-Hitachi contract already includes an express warranty of fitness for a particular purpose, B&W would ordinarily have no need to rely on a corresponding implied warranty.  However, because the scope of the express warranty is unclear, the Court must also address the nature of the implied warranty.

Under the UCC, this implied warranty arises when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."  Ohio Rev. Code § 1302.28.  The present case is a prime example of a situation in which the implied warranty of fitness for a particular purpose applies.  B&W sought out Hitachi to engineer and construct catalyst specifically for use in the SCR system that B&W designed.  Hitachi knew of the purpose for the catalyst and agreed to construct the catalyst according to particular specifications.

While a party is free to disclaim all warranties other than those expressly stated within the contract, the Code limits the ability to disclaim the implied warranty of fitness for a particular purpose.  Ohio Rev. Code § 1302.29 provides that "to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that 'There are no warranties which extend beyond the description on the face hereof.'"  The Code itself defines the term "conspicuous": "'Conspicuous.' A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color."  Ohio Rev. Code § 1301.01(J).

-25-

Case No. 5:05-cv-00047
Gwin, J.

Additionally, the Code provides that the issue of conspicuousness is a matter of law and thus "is for decision by the court." *Id.*

In the present case, the Court finds that the provisions are not sufficiently conspicuous to disclaim the implied warranty of fitness for a particular purpose. The limited remedy and liability provisions appear at the end of the section on performance guarantees in a subsection entitled "Non-fulfillment of guarantee of catalyst." This heading appears in the same fine print as the remainder of the text and there is no subheading specifically related to limiting the remedy or liability. Moreover, the applicable provisions are in the same fine print and are included in the same paragraph discussing the steps Hitachi will take to fix any catalyst defect. *See Zurich-American Ins. Co. v. Citadel Alarm*, No. 50499, 1986 WL 5291, at *3 (Ohio App. May 8, 1986) (holding that a disclaimer of warranty clause that was one of a number of inconspicuous clauses contained in the body of the agreement was insufficient); *Ohio Sav. Bank v. H.L. Vokes Co.*, 54 Ohio App. 3d 68, 560 N.E.2d 1328 (Ohio App. 1989) (holding that a disclaimer of warranty appearing in contrasting, solid capital letters was sufficiently conspicuous). Finally, the section says nothing about disclaiming any additional warranties, whether express or implied. The Court thus finds that any alleged disclaimer included in the BHK Specification performance guarantee is insufficiently conspicuous to waive the implied warranty of fitness for a particular purpose.

Therefore, the B&W-Hitachi contract includes the BHK Performance Guarantee, the express warranty embodied in paragraph 11 of the Purchase Order, and an implied warranty of fitness for a particular purpose. These clauses appear to be somewhat inconsistent in that the BHK Performance Guarantee contains a limitation of remedy and liability, while the more general express warranty contains no such limitation. Due to insufficient evidence of the parties' intent, the Court

Case No. 5:05-cv-00047
Gwin, J.

cannot at this stage reconcile these inconsistencies.

## CONCLUSION

The Court **GRANTS** in part and **DENIES** in part both B&W and Hitachi's motions for partial summary judgment.  More specifically, the Court finds that the B&W-Hitachi contract includes the December 8, 1999 BHK Performance Guarantee.  The contract also includes the general warranty appearing in paragraph 11 of the terms and conditions of the B&W Purchase Order, as well as an implied warranty of fitness for a particular purpose.  At this time, the Court lacks sufficient evidence to determine the extent to which the parties intended the limitation of remedy and liability portions of the BHK Performance Guarantee to affect the scope of the Purchase Order's general warranty.  The Court thus preserves this issue for trial.

IT IS SO ORDERED.


Dated: December 14, 2005                    s/        *James S. Gwin*
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE

-27-